AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Paul Fredrick Giusti | ) | 3-20-71664 MAG |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

**FILED**

Nov 18 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____November 2018_____ in the county of _____San Francisco_____ in the _____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 666(a)(2) | Count 1: Bribery of a Local Official |
| 18 U.S.C. 1956(a)(1)(B)(i) | Count 2: Concealment Money Laundering |
| | |
| | Max. Penalties: Count 1: 10 yrs prison; $250,000 fine or not more than the greater of twice the gross gain or twice the gross loss; 3 yrs. supervised release; $100 special assessment. Count 2: 20 yrs. prison; $500,000 fine or twice the value of the property involved in the transaction; 3 yrs. supervised release; $100 special assessment. |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint.

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Alexandra Shepard

Sworn to before me by telephone.

Date: _____11/17/2020_____

City and state: _____San Francisco CA_____

Mark Twitchell /s/
*Complainant's signature*

Special Agent Mark Twitchell, IRS
*Printed name and title*

*Judge's signature*

Hon. Sallie Kim, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT AND ARREST WARRANT

I, Mark Twitchell, Special Agent with Internal Revenue Service Criminal Investigations, being duly sworn, state:

## I.      INTRODUCTION AND AGENT QUALIFICATIONS

1.      I submit this affidavit in support of a two-count Criminal Complaint against PAUL FREDRICK GIUSTI (hereinafter "GIUSTI"). As set forth below, there is probable cause to believe that GIUSTI bribed Mohammed NURU, the former Director of the San Francisco Department of Public Works, in violation of 18 United States Code Section 666(a)(2) and 2, and engaged in a financial transaction for the purpose of concealing the proceeds of honest services wire fraud, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

2.      I am a Special Agent of the United States Department of the Treasury, IRS-Criminal Investigations (IRS-CI), and have been so employed since April 2009. I am currently assigned to the Oakland Field Office, and I am trained and authorized to investigate the offenses alleged herein. I completed the required Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Glynco, GA. This training included courses in conducting criminal investigations, federal criminal statutes, financial analysis and the law of search and seizure under the Fourth Amendment of the United States. I have also attended specialized seminars with a focus on narcotics and money laundering.

3.      During my employment with IRS-CI, I have personally conducted criminal investigations involving violations of the internal revenue laws, money laundering violations, and related financial crimes. I have participated in the execution of at least 80 federal search warrants related to the above-mentioned investigations. Additionally, I have personally been the affiant of over 20 search and seizure warrants in connection with those crimes.

4.      Prior to being a Special Agent, I was a Revenue Agent with the IRS for two and a half years. As a Revenue Agent, I conducted examinations of tax returns to determine compliance with Internal Revenue laws.

5.　　　　I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources, among others:

    a.　my experience investigating money laundering and other illegal activity relating to public corruption;

    b.　oral and written reports about this investigation that I have received from federal agents, including other agents of IRS-Criminal Investigations and the Federal Bureau of Investigation;

    c.　physical surveillance conducted by the FBI, the results of which have been reported to me either directly or indirectly; and

    d.　recorded conversations.

6.　　　　The conversations I summarize below were largely derived from various meetings and intercepted communications. Collectively, these meetings, calls, and communications were documented in IRS-CI and FBI reports and summaries. These reports and summaries describe recorded conversations involving subjects of the investigation, during which the subjects at times use code words and/or cryptic language to disguise conversations about their criminal schemes and related activities. The reports are summarized based on agents' interpretations of the conversations. Some of these reports and summaries contain interpretations of coded words, cryptic language, and vague identifiers. It may be that subsequent review of the recorded conversations and verbatim transcripts may show changes from the summaries initially prepared. Quotations from the recordings are based on informal transcriptions of portions of certain key recordings, which may not be exactly the same as formal transcriptions that are later prepared.

## II.　　APPLICABLE LAW

7.　　　　Title 18, United States Code, Section 666(a)(2), prohibits bribery of local officials who are agents of organizations receiving federal funds. The elements of the offense include the following:

      a.   A person was an agent of an organization, a state, local or tribal government, or an agency of a state, local, or tribal government;

      b.   The organization, state or local government received federal assistance in excess of $10,000 in a one-year period;

      c.   The one-year period of federal assistance was within twelve months before or after the commission of the offense;

      d.   The defendant gave, offered, or agreed to give a thing of value to any person;

      e.   The defendant intended to influence or reward the agent of the organization or agency in connection with a transaction or series of transactions of the organization or agency that involved $5,000 or more; and

      f.   The defendant acted corruptly.

8.     Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits concealment money laundering. The elements of the offense include the following:

      a.   The defendant conducted a financial transaction involving property that represented the proceeds of prior, separate criminal activity (namely, honest services wire fraud);

      b.   The defendant knew that the property represented the proceeds of some form of unlawful activity; and

      c.   The defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

9.     Under Title 18, United States Code Sections 1956 and 1961(1), "specified unlawful activity" includes any act which is indictable under Title 18, United States Code Section 1343 (wire fraud).

III.   **FACTS ESTABLISHING PROBABLE CAUSE**

A. <u>**Overview**</u>

10.     From in or around February 2012 until June 2020, Paul GIUSTI was the Group Government and Community Relations Manager for the Recology entities in the City and County of San Francisco (the "City").[1]  Recology provides waste collection services for San Francisco residences, businesses, and City entities.

11.     In his capacity as Group Government and Community Relations Manager for Recology, GIUSTI agreed in November 2018 to give $20,000 to Mohammed NURU, then the Director of the San Francisco Department of Public Works ("DPW"),[2] for NURU's use in throwing the annual DPW holiday party.  GIUSTI agreed to give the money to NURU to influence NURU's actions as the Director of DPW, specifically his efforts to help Recology implement a price increase on dumping fees, known as "tipping fees," that it charged the City. NURU and GIUSTI arranged for the payment to be concealed as a "holiday donation" to the Lefty O'Doul's Foundation for Kids, a non-profit organization for underprivileged children in San Francisco.  GIUSTI then arranged for Recology to issue a $20,000 check to the Lefty O'Doul's Foundation and mailed it to Nuru, who gave it to Nick Bovis, the head of the Foundation.  Bovis used the money to pay for expenses associated with Nuru's holiday party and not for underprivileged children.

12.     As described below, this conduct was part of a much larger pattern and course of conduct in which GIUSTI arranged for Recology to provide a stream of benefits to NURU worth over $1 million, intending to influence and reward NURU in connection with his role as Recology's regulator.  Recology had a regular, ongoing need for NURU's assistance and

---

[1] The three entities are Recology San Francisco, Recology Golden Gate, and Sunset Scavenger.  For ease of reference, this affidavit will refer to all three San Francisco entities collectively as "Recology" unless a reference to the specific entity will help my explanation.

[2] While still serving as Director of DPW, NURU was charged by Criminal Complaint with Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020 and by a separate Criminal Complaint with False Statements in violation of 18 U.S.C. § 1001 on January 28, 2020.

approval.  In particular, Recology wanted to ensure NURU's cooperation in connection with his role in approving Recology's requests for rate increases for residential garbage collection. Recology also wanted to ensure that NURU approved Recology's other requests for funding and otherwise resolved issues Recology encountered in connection with City contracts and approvals, such as the "tipping fee" price increase described above.  As one high-level Recology executive, Recology Executive 1, explained to a subordinate in an email: "Mohammed is the Director of the DPW who ultimately signs off on our rates.  Needless to say, keeping him happy is important." Based on my knowledge, training, and experience, GIUSTI was the person at Recology who was tasked with keeping NURU happy.

13.     To ensure that NURU would act in Recology's favor, GIUSTI arranged for Recology to provide NURU with a continuous stream of additional money and benefits over a period of several years, including  1) annual contributions from 2016 to 2019 to pay for the DPW holiday party, disguised as charitable donations to the Lefty O'Doul's Foundation;  2) approximately $1,000,000, funneled from one non-profit organization to another at NURU's direction and deposited into funds which NURU controlled; 3) a job for NURU's son at Recology and then—after the arrangement was discovered— an internship for NURU's son at yet another non-profit, paid for by Recology in the form of a generic grant for a summer youth internship program; and 4) a funeral for a DPW employee, which GIUSTI arranged for Recology to secretly pay for by having one of the non-profits which worked closely with NURU pay the mortuary bill and then create a fake donation invoice.  These payments were in contrast to other donations by Recology for a DPW program in which it partnered, which were not funneled through multiple non-profits to conceal their source, or disguised by false charitable donation receipts.  And, as described in further detail below, these payments and benefits were, over and over, closely tied in time to significant events in Recology's ongoing need for Nuru's assistance and approval.

14.     The benefits that GIUSTI arranged for Recology to provide to NURU were valuable to NURU in a variety of ways.  The increasingly elaborate DPW holiday party

showcased his stature in the City and the community.  NURU used the regular flow of money to keep his employees happy by providing them with benefits such as holiday events, big Public Works Week picnics, a health fair with acupuncture and massages, staff lunches, awards, Public Works gear, and even a treadmill for the DPW yard.  NURU relied on the steady flow of money from Recology and others to project the image that he was, as his Twitter handle suggested, "Mr. Clean SF"—the man who got things done in San Francisco.  By ensuring that he was perceived this way by people who wanted to do business with DPW, and by ensuring that his employees were happy and would, indeed, get things done, NURU facilitated the bribery and kickback schemes which enriched him personally.[3]

15.     San Francisco Campaign and Government Code Section 3.216 specifically prohibits any officer or employee of the City from soliciting or accepting a gift from a person or company "doing business with or seeking to do business with the department of the officer or employee," such as Recology.  Similarly, Recology's employee handbook explicitly prohibits employees from giving any loan, money or other valuable good or service to any public or private official to influence any official act.

**B.  Individuals and Entities**

16.     In his capacity as Group Government and Community Relations Manager for Recology in San Francisco from 2012 to 2020, GIUSTI served as Recology's liaison to elected officials and City departments such as the Department of Public Works, as well as to community organizations.  In his performance reviews, GIUSTI was consistently praised for his close relationships with City officials and described as being "known to be the go to person for elected officials, and city staff alike."

---

[3] A number of individuals have been charged in connection with bribes paid to NURU; several have already agreed to plead guilty.  See *United States v. Nick Bovis* (guilty plea to honest services fraud, May 2020); *United States v. Walter Wong* (guilty plea to conspiring to commit honest services fraud and money laundering, June 2020); *United States v. Balmore Hernandez* (guilty plea to bribery, September 2020); *United States v. Florence Kong* (guilty plea to bribery and false statements, September 2020); *United States v. Alan Varela and William Gilmartin III* (charged with bribery, September 2020).

17.     Recology is a waste management company that services residential and commercial customers in San Francisco and other municipalities in multiple states, through various subsidiaries. As noted previously, Recology provides refuse collection services for residential and commercial customers in San Francisco, as well as for the City itself, through the three companies in its San Francisco Group.

18.     At all times material to this Complaint, Mohammed NURU was the Director of Public Works (DPW) for the City and County of San Francisco.[4]

### C.  NURU's Influence Over Recology's Business in the City of San Francisco

19.     As Director of Public Works, NURU had great influence over the City's relationship with Recology. In particular, NURU had substantial influence over Recology's ability to increase yearly revenue and access millions of dollars for capital improvements. As described further herein, NURU played a very significant role in the process by which Recology periodically sought to increase the rates paid by the citizens of San Francisco for garbage collection. Understanding the rate increase process and other ways in which NURU exercised influence over Recology is key to understanding why Recology, aided and abetted by GIUSTI, directed a regular stream of benefits at NURU over a period of years—and also why GIUSTI arranged to hide much of it in the form of donations to non-profit organizations at NURU's direction.

20.     Recology has a monopoly on residential garbage collection services in the City under the Refuse Collection and Disposal Initiative Ordinance ("1932 Ordinance"), which was

---

[4] The City and County of San Francisco is a local government that received federal assistance in excess of $10,000 during a one-year period within twelve months before or after November 2018. According to the Budget and Appropriations Ordinance passed by the San Francisco Board of Supervisors on August 1, 2018, for the Fiscal Year ended June 30, 2019, 4.4% of all funds appropriated for use by City departments came from federal funding, over $483 million. Federal funding also constituted 5.1% of the City's general fund, a total in excess of $278 million. See File No. 180574, Ordinance No. 0181-18 (Budget and Appropriation Ordinance) (available at https://sfbos.org/ordinances).

approved by San Francisco voters in 1932.[5]  Pursuant to the 1932 Ordinance, Recology must

seek approval from the City of San Francisco to raise the rates it charges to residential

customers.  The Director of Public Works is in charge of that process, under the auspices of the

City's Refuse Collection and Disposal Rate Board ("Rate Board").  DPW Order No. 185078,

signed by NURU on July 11, 2016, lays out the Rules of Procedure concerning the rate increase

application process and details the importance the Director of Public Works has over the

process.[6]

      21.     A review of the significant events in the process is helpful to understanding the

events described in this affidavit.  Prior to initiating a rate increase, Recology engages in

meetings and communications with DPW for a period of weeks and months about the substance

and timing of its anticipated application.  The formal process is then initiated when Recology

files a 120-Day Notice of Intent to File Application ("Notice of Intent"), in the form of a letter to

the Director of DPW.  Recology then submits a draft application, which is reviewed and

evaluated by DPW.  Ultimately, Recology submits a final application.  DPW and other

stakeholders evaluate the report, and the Director of DPW holds public hearings.  The Director

of DPW then issues a Report and Recommended order on adjusting rates.  If there are objections

by members of the public, Rate Board will hold additional hearings and then make the final

decision, based on the recommendation of the Director of Public Works.[7]  If the Rate Board does

not make a decision within 60 days after the Director has filed his Report and Recommended

Order, the Recommended Order takes effect.

---

[5] The 1932 Ordinance created a regulatory scheme for residential garbage collection and approved 97 separate permits for residential collection in the City.  Over time, the company that is now Recology acquired all of those permits.

[6] DPW's website also explains how the formal public process works, and provides copies of key documents and testimony in connection with Recology's rate increase applications in 2013 and 2017.  *See* https://sfpublicworks.org/refuserates.

[7] During Recology's 2016-2017 rate increase application process, the Refuse Rate Board included City Administrator Naomi Kelly, General Manager of the Public Utilities Commission Harlan Kelly (Naomi Kelly's husband), and the City Controller.

22.     The Director of Public Works holds enormous power over this process. The Director reviews Recology's applications, accepts or rejects modifications to the rate increase application, holds public hearings, responds to any objections to the report by the public, and makes a final recommendation to the Rate Board on Recology's requested rate increases. NURU's approval was therefore essential to any request for a rate increase by Recology.

23.     Recology applied for a rate increase every few years. Most recently, Recology went through a rate increase application process from September 2016 to June 2017 ("2017 rate increase application"), culminating in an average 20.98 percent increase in rates charged for refuse collection from residential and apartment buildings. Prior to that, Recology went through a similar process in the 2012-2013 time frame, culminating in approval of an average increase of 19.89 percent for residential and apartment building collection, effective August 2013.

24.     Based on figures reported by Recology in their yearly reporting of revenues and expenses to the City of San Francisco, the following table summarizes the significance of the 2017 rate increase to Recology's revenues subject to rates:

| RECOLOGY - SAN FRANCISCO ANNUAL RATE REPORT Summary of Revenues Subject to Rates Fiscal Year Ending June 30th Dollar Amount Rounded in Millions | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2015 | | 2016 | | 2017 | | 2018 | |
| Rate Revenue | YOY % increase | Rate Revenue | YOY % increase | Rate Revenue | YOY % increase | Rate Revenue | YOY % increase |
| $  275 | N/A | $  279 | 1% | $  289 | 4% | $  351 | 21% |

25.     In his capacity as Group Community and Government Affairs Manager at Recology, GIUSTI was the public face of Recology's 2017 rate increase application. He was responsible for a variety of outreach and public communications functions, including responding to media inquiries about the rate process, communicating with the San Francisco Board of Supervisors, rate payers, and commercial groups, serving as a liaison with the Rate Payer Advocate appointed by the City to represent the interests of rate payers in the process, helping Recology develop the proposed schedule for the rate increase process with the City, and testifying during public hearings.

26.     GIUSTI's importance to the 2017 rate increase application was demonstrated by the fact that his annual review for 2017 was primarily focused on his role in getting the rate increase accepted. He was praised, for example, for minimizing negative press about the rate increase application: "[m]ost of the mainstream media efforts were centered around avoiding bad press regarding the rate structure. Paul was successful and little to no press was focused on it."

27.     The residential rate increase process was very important for Recology not just because residential garbage collection was a significant revenue stream for the company, but also because other significant revenue streams were tied to residential collection rates: specifically, rates for commercial garbage collection and City of San Francisco municipal garbage collection. Although these rates were not regulated in the same way as residential rates, I have reviewed information which indicates that both sets of rates historically increased at the same percentage as residential rates. Therefore, when Recology increased its residential collection rates, commercial and City rates also went up.

28.     In addition to having a monopoly position on residential garbage collection, Recology has separate contracts with the City of San Francisco for other services. It currently has a six-year, no-bid contract for garbage collection from the City itself, including City buildings, streets, and parks. That contract has a "not to exceed" value of $48 million approved by the Board of Supervisors on November 19, 2019, up from $40 million when it was first approved by the Board of Supervisors on November 25, 2014. Recology also has two smaller contracts with the City. One of those contracts, for dumping materials at Recology's subsidiary Sustainable Crushing (Term Contract 75961), is the subject of the charged conduct.

29.     Additionally, Recology needed NURU's approval to access millions of dollars located in incentive accounts funded by refuse collection revenues, commonly called the Zero Waste Funds. The Director of Public Works ultimately approved or denied the access of these funds. Between December 2015 and February 2017, NURU approved Recology's requests for over $10 million dollars of the Zero Waste Incentive Funds for capital improvements.

### D. The DPW Holiday Parties

#### 1. GIUSTI Arranges for Recology to Pay for DPW Holiday Parties, Disguised as Charitable Donations to the Lefty O'Doul's Foundation for Kids

30.     From 2016 to 2019, Recology made increasingly large "holiday donations" to the Lefty O'Doul's Foundation for Kids, which were orchestrated by GIUSTI. The Lefty O'Doul's Foundation is a non-profit organization led by Nick Bovis.[8] Its stated purpose is to provide underprivileged children the opportunity to experience baseball by providing them with bats, gloves, equipment, and tickets to baseball games. However, the purpose of Recology's yearly contributions to the Lefty O'Doul's Foundation was not to introduce underprivileged kids to baseball. Instead, the money went to fund an increasingly extravagant holiday party that NURU organized for certain DPW employees and other San Francisco city officials and invited guests.

31.     The holiday party was originally a more casual affair for DPW employees. Beginning with the 2016 party, NURU requested that Nick Bovis use his non-profit organization, the Lefty O'Doul's Foundation, to organize and help pay for the DPW holiday party. The party grew larger and more elaborate over time, moving first to the Green Room at the San Francisco War Memorial, and then to the dramatic hall in the James R. Herman Cruise Terminal at Pier 27. Nuru selected the guest list, which expanded to include various San Francisco dignitaries and other VIPs, including Recology executives, but did not include all DPW employees. At some point the party also expanded to include the San Francisco General Services Agency, a collection of various departments under the City Administrator's Office.

32.     In 2017, NURU tasked a DPW public relations employee with planning the holiday party with Nick Bovis and other vendors. The importance of the parties to NURU is demonstrated by the fact that he was deeply involved in the planning. I interviewed a DPW employee who helped plan several of the parties in the 2016-2019 time frame. The employee

---

[8] Bovis was charged with honest services fraud along with NURU in the January 15, 2020 Criminal Complaint. Bovis pled guilty on May 21, 2020 pursuant to a cooperation plea agreement.

informed me that NURU selected who would be invited by DPW and even instructed the employee on how to invite guests (by phone or by email). I also reviewed a November 14, 2019 email which demonstrates the level of NURU's involvement in the planning. The DPW employee wrote to a chef who was supplying some of the food, "Here are a few takeaways from my second meeting with Mohammed yesterday afternoon: He wants to see a complete list of menu options to choose from…Mohammed also wants to make sure that Nick hires someone to bring in African food in addition to these items and sushi….He is still unsure if he wants to bring in sushi from Tomokazu or use your guys….Ultimately, he is going to request a complete breakdown of all the costs for the event."

33.    As stated by multiple witnesses involved in planning the holiday party at NURU's direction, the party grew in size and costs each year after 2016. Based on my review of records, below are the approximate costs of the yearly holiday party:

| Holiday Party Costs Per Year | | | |
|---|---|---|---|
| Party Date | 12/20/2016 | 12/19/2017 | 12/18/2018 | 12/20/2019 |
| Approximate Costs | $12,290.00 | $31,510.00 | $34,738.75 | $52,638.42 |

34.    In order to pay for the parties, NURU and individuals associated with him solicited money from City contractors such as Recology. NURU directed that the payments be made to non-profit organizations including the Lefty O'Doul's Foundation. The money would then be used by the Foundation to pay for party expenses as approved by NURU. Based on my knowledge, training and experience, I believe NURU purposefully used the Lefty O'Doul's Foundation to facilitate the receipt of contributions from various contractors, in an effort to conceal source of the funding for his holiday party and disguise the payments as charitable donations.

35.    Recology was the largest contributor to these DPW holiday parties. Recology made its first contribution to the Lefty O'Doul's Foundation for the holiday party during its 2017 rate increase application process, and the two events are very closely coordinated in time. On December 5, 2016, GIUSTI met with NURU and the DPW employee overseeing Recology's rate

increase application at NURU's office in City Hall. That same day, Recology Assistant A prepared a check request for $5,000 for a "Holiday Donation" to the Lefty O'Doul's Foundation. The check request did not mention the DPW holiday party. The form requested that the check be sent FedEx Overnight to GIUSTI, and Recology Executive 2 approved the payment. On December 12, 2016, Recology issued a check for $5,000 to the Lefty O'Doul's Foundation. The next day, December 13, 2016, Recology formally submitted its draft 2017 rate increase application to NURU, which requested a 21.43 percent increase in residential collection rates.

36.     Recology continued to contribute to the DPW holiday party by making "holiday donations" to the Lefty O'Doul's Foundation, and the payments increased each year. In October 2017, Recology contributed $15,000. In November 2018, as discussed in further detail below, Recology increased its "donation" to $20,000. In November 2019, Recology contributed another $20,000. None of the internal check requests mentioned the DPW holiday party. Each payment was either requested by GIUSTI or requested to be mailed overnight to GIUSTI. The payments were all approved by GIUSTI's supervisors, Recology Executive 1 or Recology Executive 2. In total, GIUSTI arranged for Recology to contribute $60,000 to the Lefty O'Doul's Foundation to fund NURU's holiday party.

### 2. GIUSTI Agrees to Increase Its 2018 DPW Holiday Party Contribution in Return for NURU's Efforts to Get Recology An Increase in Tipping Fees

37.     In November 2018, GIUSTI arranged for Recology to increase its contribution to NURU's holiday party from $15,000 to $20,000. The increased contribution was explicitly tied to Recology's request for NURU's assistance in obtaining a price increase on the "tipping fees" Recology charged the City. Recology, through GIUSTI and others, sought NURU's assistance with this price increase after the company ran into trouble with a City purchasing administrator who would not agree to pay invoices which reflected the increased fees. GIUSTI was involved in Recology's efforts to get NURU's assistance with the tipping fee price increase, and he agreed to increase Recology's contribution to the DPW holiday party in return for that assistance.

38.     In 2015, Recology entered into Term Contract 75961 (TC#75961) with the City. The three-year contract, which began on August 1, 2015, had a not-to-exceed value of $6.3 million for "Asphalt, Grindings, Concrete Dumping." Pursuant to TC#75961, City facilities would pay a certain amount per unit, known as "tipping fees," to dump a variety of materials such as asphalt and concrete at a Recology facility in San Francisco called Sustainable Crushing.

39.     Recology planned to increase the amount of the City's tipping fees on August 1, 2018. According to an email I have reviewed, Recology intended to increase its rates by approximately 30 percent "or market conditions," which in some cases was double the original price. In the same time frame, Recology was in discussions to sell the Sustainable Crushing operation to a third party.

40.     In June of 2018, a DPW employee emailed Recology requesting certain changes to TC#75961, including a 12-month extension of the contract. Recology San Francisco General Manager A ("Recology SF General Manager A") then emailed Recology Executive 1, "This was the email we have been waiting for….Do we decline the extension." Recology Executive 1 responded, "Let me call Mohammed." I believe, based on the evidence gathered in this investigation, that "Mohammed" was Mohammed NURU. I understand and believe from evidence gathered during the investigation that the State of California specified a process for increasing prices, and Recology did not follow that process.

41.     Recology SF General Manager A and Recology Executive 1 then sought GIUSTI's assistance with the price increase, telling him, "We are going to have to have a conversation with DPW to put our current pricing into perspective with our business objectives." GIUSTI responded, "If you think we will be ready I can lob in a call to Mohammed and see if we can get on his calendar sometime early in the week….I think we can get Mohammed to yes, it just has to make sense to him quickly and look like a win for all parties….If Mohammed sees we are in step with [the third party purchaser] on pricing and timeline it will translate to him knowing he has a place to continue dumping his trucks and at a price, albeit a justifiable higher one, he can budget for." Based on my knowledge, training, and experience, I believe Recology

14

Executive 1 and Recology SF General Manager A wanted GIUSTI's help because he was Recology's primary contact with NURU.

42.     GIUSTI, Recology Executive 1 and Recology SF General Manager A then met with NURU on June 28, 2018.  The following Monday, July 2, Recology Executive 1 emailed NURU, "Great to see you last week.  As discussed, please see the update pricing for Sustainable Crushing based on the market analysis we completed…."

43.     A few days later, Recology SF General Manager A forwarded Recology Executive 1's July 2 email to the DPW employee responsible for TC#75961.  He wrote that he and Recology Executive 1 "had a meeting with Director NURU to discuss SF Public Works tipping fees at Sustainable Crushing.  Attached, please find a price sheet that was presented to the Director last week.  Recology SF would like to have the tipping fees associated with our PO adjusted to reflect the price structure attached."  I believe, based on my training and experience and the context of the document, that he forwarded the NURU email to NURU's subordinate to make it clear to her that he had gone over her head and expected that she would do as he said and accept Recology's price increase.  Ten minutes later, Recology SF General Manager A emailed two other Recology employees, "The ball is in motion with the PI. I think it's going to take a few more volleys to get it over the net."  Recology reached out to the DPW employee again later in July to try to push the price increase forward.  I believe, based on documents I have reviewed, that Recology then sent August and September invoices with the new prices to the City for payment.

44.     On October 5, 2018, an Assistant Purchaser in the City's Office of Contract Administration requested a one-year extension on TC#75961.  Recology SF General Manager A signed the contract extension on October 22, 2018.  I have reviewed the extension and it makes no mention of a price increase.

45.     Approximately three weeks later, on November 12, 2018, Recology sent its October 2018 invoice under TC#75961 to a junior administrative analyst in the City Contract Administrator's office.  The invoice reflected the increased pricing which Recology previously

discussed with NURU. The City analyst pushed back, noting that Recology's contract with the City did not contain increased prices and requesting revised invoices for August, September and October 2018. I have reviewed copies of those invoices; they reflect Recology's desired price increases, and totaled approximately $130,000.[9] Recology responded to the analyst by sending her a copy of the letter they sent to DPW in summer 2018 with their new prices.

46.     On November 15, 2018, the City's analyst emailed Recology a copy of the contract modification that Recology SF General Manager A had signed three weeks earlier, noting, "There is no price change." Recology SF General Manager A then emailed GIUSTI and Recology Executive 1 to tell them that Recology had a problem: "It looks like the purchaser who was assigned to process our price increase for the DPW street repair dumping, returned an executed agreement back to us without the price increase despite our efforts to get the increase. This means that the city is not willing to acknowledge the PI we gave them back in July and has requested that we modify all of the invoices to reflect the old contract pricing. Obviously we need to push the increase through and we are not going to get anything done with the purchaser." He requested a meeting with GIUSTI and Recology Executive 1. Recology SF General Manager A then texted GIUSTI: "Sent you an email this morning about the DPW disposal contract for innards they don't want to honor the price increase that we negotiated with Muhammad." GIUSTI responded, "Ok let me look at it." I believe, based on my knowledge, training, and experience, that Recology SF General Manager A was once again reaching out to GIUSTI for assistance with the price increase because of his relationship with NURU.

47.     On November 20, while the issue of a price increase was still pending between Recology and the City, GIUSTI emailed Recology Assistant A and asked, "Can you please tell me what we spent last year around this time for Lefty O'Doul Foundation?" I believe, based on

---

[9] By way of example, the August 2018 invoice included a line item for the commodity code "Asphalt Grindings, 10 Wheeler," which totaled $32,100. The amount was billed at Recology's desired price of $300 per unit. Had Recology invoiced the City under the contract price of $200 per unit, the bill for that line item would have been $21,400—a difference of $16,000.

the context and my review of the evidence, that GIUSTI was trying to find out how much Recology had paid NURU the previous year for the DPW holiday party in advance of a regular monthly coordination meeting with NURU scheduled for the next day.

48.     Also on November 20, the City's analyst again requested that Recology work on revising their prior invoices, presumably to reflect the original prices, so that the City could pay them. The Recology employee responded by advising the analyst, "My boss is meeting with your Director tomorrow on this very issue. I will get back to you as soon as I here of the resolution." I have reviewed documents which confirm that the meeting happened as scheduled on November 21, 2017. GIUSTI, Recology Executive 1, NURU and others were scheduled to attend.

49.     On November 26, 2018, at approximately 9:21 a.m., Recology Executive 1 forwarded to NURU the email from Recology SF General Manager A alleging that the City was not honoring the negotiated price increase. He wrote to NURU, "As discussed, any help you could provide getting the new purchaser aware of our price change would be appreciated." NURU wrote back about 90 minutes later, "Working on situation."

50.     That same day, November 26, 2018, NURU spoke to Nick Bovis on two intercepted phone calls about Recology's payment for the DPW holiday party. NURU told Bovis, "Yeah, call me right back because they are asking….I told them to send you a check…. They are asking how much….I told them to do me a, you know, uh to do a new amount for me and I don't, I can't remember what to tell them….Why don't you let me know and they'll send you a check for sure….Yeah, I just need to call them and let them know."

51.     Later that evening, at approximately 10:14 PM, GIUSTI called NURU on an intercepted call. First, they spoke about a "contribution," which I believe, based on the evidence I have reviewed, refers to Recology's contribution to the DPW holiday party:

NURU:   Good. I got a call, uh, about the contribution.

GIUSTI:   Okay.

17

NURU:      Yeah, so last year was fifteen thousand you guys gave us.

GIUSTI:    Yeah.

NURU:      Yeah, so anything you can do, either match it or give me a little more that would help.

GIUSTI:    Okay, all right.

NURU:      Because I always have to go get more, I have to get, I think about another twelve thousand or so more.

GIUSTI:    Wow, oh, okay.

NURU:      [Unintelligible] Yeah, so if you could, if you could give me twenty, that would be nice.

GIUSTI:    All right, okay.

52.      NURU then pivoted to issues affecting Recology, specifically, how NURU was advocating on Recology's behalf in his official capacity as Director of Public Works:

NURU:      And then I'm working on the other thing for [Recology Executive 1], so…

GIUSTI:    Okay, perfect.

NURU:      I sent him the freeway people, I sent him that and then I'm trying to get him the price increase for the…

GIUSTI:    Tipping.

NURU:      For the specialty, yeah.

GIUSTI:    Yeah.

NURU:      The problem there is [Recology SF General Manager A] signed an agreement in, uh, October that he was okay with an extension, and he never brought up the issue of the price change.

GIUSTI:    Yeah, yeah, because I think there was gonna be that deal with [Third Party Purchaser] and then it didn't, it didn't happen, so…

NURU:      Yeah, I'll try and make it happen, but he should have brought it up at that time, that's what the attorneys are saying that...

18

GIUSTI:   Yeah.

NURU:   If they had a price increase, why didn't that say it at that time so that we could just adjust it before they find it.

GIUSTI:   Yeah.

NURU:   Yeah, but I'll get it, yeah just…

GIUSTI:   Okay, yeah cuz....

NURU:   [Unintelligible] Just send me the bills with the new price and we'll deal with it, yeah.

GIUSTI:   Okay, all right, thank you.

NURU:   I'm working on it, I'm working on it on our side, yeah.

GIUSTI:   Okay.

NURU:   We'll get it.

GIUSTI:   Okay, all right.

53.     Based on my training and experience, and the evidence I have reviewed in this investigation, NURU solicited contributions from GIUSTI and Recology for the DPW holiday party in exchange for official acts by NURU in his capacity as Director of DPW. As detailed in the intercepted phone call, NURU began the call with a request that Recology increase its contribution to the DPW holiday party to $20,000. After GIUSTI agreed, NURU then told GIUSTI he was, "working on the other thing for [Recology Executive 1]." NURU used Recology Executive 1's first name only, but based on context and on documents described above, I believe NURU was referring to Recology Executive 1, GIUSTI's direct boss. NURU told GIUSTI he was, "trying to get the price increase." NURU assured GIUSTI, "I'm working on it on our side….We'll get it." NURU's promise that he was working on it is consistent with the promise he made by email earlier that day to Recology Executive 1 that he was working on Recology's request. I believe, based on the evidence in the investigation, that when NURU told GIUSTI to send him "the bills with the new price," he was referring to the Recology invoices

19

reflecting the higher prices that they had been trying unsuccessfully to get the City to pay.

54.     The next morning, at approximately 7:34 a.m. on November 27, NURU spoke with an individual on an intercepted phone call. NURU put the call on hold, and when he came back he told the DPW employee, "That was uh Recology, I have a whole 'nother problem with them…".

55.     Shortly afterwards, at 8:04 a.m., GIUSTI sent an email to Recology Assistant A enclosing a check request for a "holiday donation" of $20,000 to the Lefty O'Doul's Foundation. The form indicates that GIUSTI himself prepared the check request. GIUSTI wrote, "Can you please process. Recology Executive 1 will sign. Also see how quickly we can get the check cut and let me know. I will deliver." Recology Executive 1 signed the check request.

56.     At virtually the same time that GIUSTI emailed the check request internally at Recology, NURU called Nick Bovis on an intercepted call and told him that "Recology is going to send you twenty grand." I believe, based on the context and prior intercepted calls, that NURU was telling Bovis that Recology would send the Lefty O'Doul's Foundation $20,000 to fund the DPW holiday party.

57.     Two days later, on November 29, 2018, Recology issued a check for $20,000 to the Lefty O'Doul's Foundation for the so-called "holiday donation." The next day, November 30, 2018, GIUSTI called NURU on an intercepted call and said, "Hey, I have the, uh, donations check for Lefty O'Douls." He asked NURU about the address for the foundation, and NURU told GIUSTI to give him the check and said that he would get it a person whom I believe, based on context, was Nick Bovis. GIUSTI then mailed the check to NURU.

58.     In another intercepted phone call on December 7, 2018, NURU confirmed that the purpose of Recology's "holiday donation" to the Lefty O'Doul's Foundation was to pay for the DPW holiday party and not to help underprivileged children experience baseball. GIUSTI told NURU that he and Recology Executive 2 wanted to schedule a holiday dinner with NURU. GIUSTI suggested December 18 and NURU reminded him, "Tuesday night is the big party you helped me pay for, so that's not a good night," and then laughed. December 18 was the date of

the 2018 DPW holiday party. They settled on December 20 for dinner. GIUSTI asked NURU whether there was a special place he wanted to go, or whether he could just "pick a nice place." NURU told him, "you work it out, just a place we can drink, man." GIUSTI promised to "pick us a good place." I have reviewed evidence which shows that Recology Executive 1 paid $1,182.23 for dinner at Harris' Restaurant with GIUSTI, Recology Executive 2, NURU, and a DPW Deputy Director on December 20, 2018.

59.     The money that GIUSTI directed to the Lefty O'Doul's Foundation had no charitable purpose. I believe, based on my training and experience and my review of the evidence, that the payment was instead intended to conceal the proceeds of a bribe. Specifically, the evidence indicates that the $20,000 that Recology paid the Lefty O'Doul's Foundation in November 2018 was money intended for NURU's benefit, to influence him to intercede on Recology's behalf to help Recology get their desired tipping fee price increase. To conceal the payment, GIUSTI orchestrated a "holiday donation" to the Lefty O'Doul's Foundation, which he knew merely acted as a conduit to pay for holiday party expenses.

### E.  Additional Evidence of Corrupt Intent and *Modus Operandi*

60.     This was not the only instance in which GIUSTI directed that Recology make payments to non-profit organizations for the purpose of benefitting NURU. As detailed below, GIUSTI routinely facilitated the payment of funds from Recology to various non-profits to benefit NURU in some way. Based on my knowledge, training, and experience, I believe the continued use of non-profits by GIUSTI and Recology was deliberate, as it concealed the fact that the "donations" that Recology made were actually payments intended to benefit NURU in return for his influence.

61.     GIUSTI aided and abetted Recology's efforts to bribe NURU and conceal the bribe payments as charitable donations with the knowledge and approval of his supervisors in the San Francisco Group, including, at different times, Recology Executive 1 and Recology Executive 2.

**1. GIUSTI Arranges for Recology to Contribute over $150,000 a Year to San Francisco Non-Profit A at NURU's Direction**

62.     Between February 2013 and November 2019, Recology made 35 payments, totaling $1,030,000, to Non-Profit Organization A ("Non-Profit A") in the form of "donations" for a DPW program called Giant Sweep. GIUSTI, in his role as Recology's Group Government and Community Relations Manager, arranged for these payments at the direction of NURU and the Executive Director of Non-Profit A. Based on my training and experience, I believe that GIUSTI, on behalf of Recology, directed this regular flow of money to NURU over a period of years to influence NURU's official actions in his capacity as Recology's regulator. Non-Profit A's principal or only function in this arrangement was to serve as a pass-through entity to conceal the source of the money. NURU and Non-Profit A's Executive Director arranged for the money contributed by Recology to be immediately passed on to another non-profit, Non-Profit Organization B ("Non-Profit B"), where it was deposited into accounts that NURU used as a slush fund for his professional benefit. While it appeared that the accounts at Non-Profit B, which were routinely used by NURU and other DPW staff, were primarily funded by donations from San Francisco Non-Profit A, they were actually funded by Recology.

63.     Non-Profit A is a 501(c)(3) non-profit organization in San Francisco. Records show that from 2014 to 2018, approximately 80 percent of Non-Profit A's funding came from grants from the City and County of San Francisco, including grants from DPW and the Community Challenge Grant Program. The majority of the rest of its funding, particularly in the period from 2016 through 2018, came from Recology. Most of that money consisted of the $1,030,000 in purported donations for Giant Sweep—money which Non-Profit A immediately turned around and "donated" to Non-Profit B after taking a 5 percent cut. The remainder of the money consisted largely of payments by Recology for another DPW community program administered by Clean City.

64.     Non-Profit B is a separate 501(c)(3) non-profit organization in San Francisco which, among other functions, serves as a fiscal sponsor, or fiscal agent, for organizations or groups that do not have non-profit status and/or don't have the resources to take donations or

administer funds themselves.  A fiscal sponsor provides administrative functions and oversight on behalf of a sponsored organization or program, including accepting donations.  Non-Profit B is the fiscal sponsor for DPW on a number of projects, including, as far as the evidence I have reviewed indicates, Giant Sweep.  Recology made regular monthly donations directly to Non-Profit B for another DPW "cleaning and greening"-type program.  Based on my training and experience and my review of the evidence, these payments were different than the Giant Sweep payments.  They were not funneled through another organization.   Recology would simply send a monthly check for approximately $2,083 directly to Non-Profit B.  Non-Profit B would then deposit the check into an account set up specifically for that program.

65.   Giant Sweep was a DPW-sponsored anti-litter volunteer program initiated by then-Mayor Ed Lee after the San Francisco Giants swept the Detroit Tigers in the 2012 World Series.  DPW created and implemented the program, and the Giants lent their name and provided support in the form of promotional appearances at Giant Sweep events.  I am informed that the Giants stopped participating in Giant Sweep around August of 2015.  Based on my review of documents and publicly-available information, DPW hosted a number of Giant Sweep events from 2013 until in or around 2018, including cleanups and school assemblies, but it appears that over time the program was subsumed into other programs.

66.   The origins of Recology's donations for Giant Sweep appear to be closely tied to its 2013 rate increase application.  I have reviewed documents indicating that Recology agreed to give $100,000 per year to NURU for Giant Sweep in January 2013, right in the middle of its application process.  Recology made the first payment of $40,000 to Non-Profit A for Giant Sweep on or around February 14, 2013, approximately three days after a key event in the process: DPW's notification to Recology that their draft application was complete.  In total, Recology contributed $80,000 to Non-Profit A for Giant Sweep in the months before NURU issued his final report in June 2013 approving their requested rate increase.  Recology then gave an additional $20,000 to Non-Profit A for Giant Sweep on or around the day the rate increase

went into effect in August 2013, and another $30,000 approximately one week later. Records indicate that the donations then appeared to stop for approximately one year.[10]

67.     Beginning in August 2014, the payments began again, and through December 2019 followed a consistent pattern. Approximately once a year, Non-Profit A's Executive Director would email a letter to GIUSTI, addressed to GIUSTI's supervisor at the time (first Recology Executive 2, and later Recology Executive 1). The letters thanked Recology in advance for their tax-deductible donation of $150,000, to be paid in bi-monthly installments of $30,000. GIUSTI and Recology Assistant A would arrange for Recology to send the requested payments to Non-Profit A. Non-Profit A's Executive Director would confirm with NURU that Recology's money should be sent to Non-Profit B. Non-Profit A would then, generally within one to two weeks of receiving the money from Recology, write a check for $28,500 to Non-Profit B. The money would be deposited into one of two NURU-controlled accounts at Non-Profit B, one for Giant Sweep and one called "Special Projects." NURU then used the money as he saw fit—occasionally for DPW events which benefitted taxpayers, but often for items which benefitted NURU in some way.

68.     The evidence indicates that GIUSTI sent the Giant Sweep payments to Non-Profit A at NURU's direction. For example, on November 11, 2014, Non-Profit A's Executive Director emailed GIUSTI, "I am just following up on the status of the GS donation for November. We have not received it and Mohammed was inquiring." I believe, based on facts developed during this investigation, that "Mohammed" refers to Mohammed NURU. On November 21, 2014, Recology Assistant A advised GIUSTI that NURU's office had called Recology directly "to check if the November payment was mailed out already." In another example, on August 25, 2015, Non-Profit A's Executive Director sent an email to GIUSTI that

---

[10] During this time frame, prior to August 2019, the payments from Recology to Non-Profit A, and from Non-Profit A to Non-Profit B, were irregular in amount and frequency.

read, "Mohammed asked me to send you the Giant Sweep donation letter for 2015-2016.  It is on the same payment schedule as last year."

69.     After Recology sent the payments to Non-Profit A, Non-Profit A would typically take an "administrative fee" of 5 percent, or $1,500, and then send a check for $28,500 to Non-Profit B. Non-Profit A generally sent the checks within approximately one to two weeks of receiving Recology's payment.  In my training and experience, this fact pattern—a) the short period of time between when Non-Profit A received the money from Recology and the time when it sent checks to Non-Profit B, and b) the five percent "cut" that Non-Profit A would take from Recology's checks—is consistent with a pattern of money laundering and the fees charged for the service.  Based on my review of the evidence, there does not appear to be a reason for Non-Profit A to take a cut of the money they received from Recology.  They held the money for one or two weeks, not long enough to incur any legitimate overhead costs.  Nor did they appear to use the money for any purpose.  They simply passed the money on to Non-Profit B, which administered and processed any costs associated with the Giant Sweep program.[11]

70.     NURU directed the flow of Recology's money from Non-Profit A to Non-Profit B.  I have reviewed multiple text messages between NURU and Non-Profit A's Executive Director in which NURU confirms that the Recology payments to Non-Profit A should be sent to Non-Profit B. On or around October 25, 2018, for example, Recology wired $30,000 to Non-Profit A. On November 6, 2018, Non-Profit A's Executive Director texted NURU, "Hi. Got another GS donation.  Should I cut a check to [Non-Profit B]?"  NURU texted back, "Yes." Based on my review of the evidence in this case, I believe that "GS" is short for Giant Sweep and that the text referred to Non-Profit B.  I have reviewed Non-Profit A records which show that Non-Profit A did not receive any other donations for Giant Sweep in that time frame,

---

[11] I am informed and believe that Non-Profit B also did not take any administrative fee for the work it performed in connection with administering the DPW accounts.  I understand that this is contrary to its practice with other groups and organizations for which it serves as a fiscal sponsor.

indicating that they were discussing the payment from Recology. On or around November 7, 2018, Non-Profit A sent a check to Non-Profit B for $28,500.

71.    Non-Profit A would send the money from Recology to Non-Profit B in the form of what it called a "restricted grant," to be deposited into one or both of two accounts at Non-Profit B which were controlled by NURU: "Giant Sweep" or "Special Projects." Non-Profit B administered several similar accounts for DPW, which served as a repository for "donations" from outside parties, generally contractors doing business with DPW such as Recology.

72.    A series of intercepted telephone calls between March 21, 2019 and March 28, 2019 further reveal that GIUSTI was aware that the payments made by Recology to Non-Profit A were controlled by NURU. Evidence shows that in Spring 2019, there was some discussion between GIUSTI, NURU, and Non-Profit A's Executive Director about moving the Giant Sweep payments, and possibly other funding provided by Recology to Non-Profit A, directly to Non-Profit B or to another non-profit. On March 25, 2019, however, NURU called GIUSTI and told him to continue to send the regular $30,000 Giant Sweep payments to Non-Profit A. During the call, NURU referred to the Giant Sweep payments as the "big one." Later in that same phone call, NURU and GIUSTI discussed switching the Giant Sweep contributions to Non-Profit B in the future. Below is a transcription of this portion of the call:

> NURU: My, my, my only fear about [Non-Profit B] is that they're getting too big, so I need to, you know, they're getting too big.
>
> GIUSTI: Yeah.
>
> NURU: But that's okay. We just have to make sure they're comfortable and everything.
>
> GIUSTI: Yeah. Okay. Good. Alright.

During this portion of the call, NURU confided in GIUSTI his concern about using an organization as large as Non-Profit B to facilitate the large payments from Recology. I believe NURU's concern with Non-Profit B becoming "too big" is a reference to his understanding that larger organizations typically have more stringent internal controls of funds coming into and

going out from their accounts. NURU indicated that he would speak with Non-Profit B "to make sure that they're comfortable and everything." This portion of the call is significant because it reveals that GIUSTI knew that NURU ultimately had control of the Giant Sweep funds, that they were both aware that Non-Profit B could have issues with Recology making such large payments to its regulator, and that the money was not rooted in a philanthropic partnership with DPW or the San Francisco Giants. Ultimately, they agreed that Recology would continue to send its regular $30,000 payments to Non-Profit A.

73.     I interviewed several current and former DPW employees who told me that the DPW funds held at Non-Profit B were controlled by NURU and viewed as his money. One DPW employee called the accounts at Non-Profit B a "Mohammed thing." NURU regularly monitored the balances in all of the accounts at Non-Profit B and moved money around to make sure that the accounts were funded. I have spoken with DPW employees who managed these accounts for NURU, who stated that NURU regularly requested updates on the balances in the accounts. NURU would also request that money be transferred between accounts if the balance in an account ran low—despite the fact that donations were purportedly made for specific purposes and deposited into the corresponding accounts. For example, I have reviewed records indicating that on or around June 30, 2016, NURU requested a transfer of $61,000 from the "Giant Sweep" account to the "Special Projects" account.

74.     The evidence uncovered during this investigation indicates that while all of the DPW funds at Non-Profit B were closely controlled by NURU, the Special Projects fund was, in particular, truly a slush fund that NURU used as he saw fit. NURU or his close associates approved all of the expenditures from the Special Projects accounts, as well as the other Non-Profit B accounts. Non-Profit B, which purportedly administered these funds and cut the checks, did not play a role in approving expenditures. I believe this explains why charitable funds were used to pay for deejay services, hats, t-shirts and other merchandise, Bay to Breakers entry fees for DPW employees, funeral-related expenses, and thousands of dollars to cover the costs of food and other vendors for DPW events, including photo booths, a chocolate dessert fountain,

holiday quartets, and specialty lighting for the annual DPW holiday parties. NURU also used the Special Projects fund cover last-minute, additional costs incurred by the Lefty O'Doul's Foundation when throwing the DPW holiday party. The bulk of these extra costs was typically related to the purchase of alcohol.

### 2. The Importance of the Giant Sweep Payments

75.     Based on my knowledge, training, and experience, I believe the following two examples illustrate the purpose and importance of the Giant Sweep payments to GIUSTI, Recology and NURU.

### a) The Missing May 2015 Giant Sweep Payment

76.     In the spring of 2015, Recology began preparing its next rate increase application. At the time, Recology's plan was to file a Notice of Intent on July 2, 2015.[12]

77.     According to NURU's calendar, NURU was scheduled to meet with GIUSTI and Recology Executive 2 on March 25, 2015 to discuss "Updates re: Rate Application/New Facilities." I believe that this calendar notation indicates that NURU was aware of Recology's intended rate increase application at least as early as this date.

78.     On May 20, 2015, Non-Profit A's Executive Director wrote to GIUSTI and Recology Assistant A, "We did not receive the Giant Sweep donation for May? Please advise."

79.     The email set off a flurry of activity inside Recology. I have reviewed documents which show that within minutes, GIUSTI and Recology Executive 1 were emailing each other and others within Recology, urgently trying to find out what happened to the payment and arranging for a check to be cut and mailed as soon as possible. GIUSTI wrote to Recology Executive 1 and others, "Can you let us know when the check will be cut. This is embarrassing and is the second check just today alone that has come to the DPW Directors attention where we have failed to meet our payment commitment."

---

[12] As described further herein, Recology ultimately postponed the start of its rate increase process by approximately one year, submitting the Notice of Intent in September 2016 instead of July 2015. In the interim, it sought NURU's approval to access Zero Waste funds described earlier in this affidavit.

80.     About fifteen minutes later, at approximately 12:26 p.m., GIUSTI wrote only to Recology Executive 1, "I got my ass chewed out this morning from Mohammed and actually had to promise to write a personal check to a non-profit that has been waiting months to get paid!" Recology Executive 1 wrote back to GIUSTI about ten minutes later, "We should sit down and discuss all the politically sensitive payments that we make on a recurring basis so that we can check to ensure that those are paid regularly."  GIUSTI replied, "Not paying our commitments timely negates all the good will we build by making the donation/sponsorship in the first place."

81.     While Recology Executive 1 and GIUSTI were exchanging these emails, Recology Executive 1 sent GIUSTI a calendar invite for a meeting two days later. The subject of the meeting was "Important payment discussion."

82.     Approximately one hour later, Recology Executive 1 himself prepared, signed and emailed a check request form for the $30,000 payment to Non-Profit A, with a note indicating, "Please pay as soon as possible."  He sent it to the accounts payable supervisor, asking her, "Can you pay off of this?  If so, when can you pay?  If not, let me know what we need to do.  Our office is closed, [Recology Executive 2] is on vacation and this needs to be paid as soon as possible."

83.     Recology Executive 1 also forwarded GIUSTI's 12:26 p.m. email about his encounter with NURU to the Assistant Corporate Controller of Recology.  He wrote, "FYI – Mohammed is the Director of the DPW who ultimately signs off on our rates. Needless to say, keeping him happy is important."

84.     I believe, based on my training and experience and my review of the evidence, that this sequence of events demonstrates that the purpose of the Giant Sweep payments was to keep NURU happy, because NURU was responsible for approving Recology's rate increase requests—including the rate increase request that Recology planned to initiate a few weeks later.

**b)  Giant Sweep Money Redirected to the Special Projects Fund**

85.     When Recology initiated its rate increase process in September 2016, the nature of the Giant Sweep payments changed.  NURU's calendar for August 18, 2016 contained a

meeting entitled "[Non-Profit A Executive Director]-Giant Sweep Funding."  Less than a week later, on August 24, 2016, Non-Profit A's Executive Director sent an email to GIUSTI and Recology Assistant A enclosing the annual Giant Sweep solicitation letter.  She wrote, "Mohammed asked me to email you another donation letter for the Giant Sweep, similar to last year."  The request was, in fact, similar to the prior years, but it was not the same:  the solicitation letter now thanked Recology for supporting not just the Giant Sweep program, but "SF DPW staff enrichment and community events."

86.     On September 2, 2016, Recology wired $30,000 to Non-Profit A.  That same day, it submitted its formal Notice of Intent to NURU, notifying him that Recology intended to submit a rate increase application.

87.     On September 9, 2016, Non-Profit A sent the Recology money to Non-Profit B, minus its 5 percent cut.  In the cover letter, Non-Profit A noted for the first time that the money was not just for Giant Sweep, but also for "DPW's staff enrichment and community events."  I have reviewed evidence which indicates that the Recology money was then split fifty-fifty between the Giant Sweep account at Non-Profit B and NURU's "Special Projects" account.  Based on my knowledge, training and experience, I believe it was not a coincidence that Recology's money was directed for the first time to the NURU-controlled Special Projects slush fund at exactly the same time that Recology initiated its 2017 rate increase application.  I believe that this was another way to 'keep Mohammed happy.'

### 3.  GIUSTI Arranges for Job and Internship for NURU's Son

88.     In June 2015, while Recology was preparing to submit the Notice of Intent for its planned rate increase application, GIUSTI arranged for Recology to hire NURU's son.  Based on my training and experience, I believe that GIUSTI arranged a job for NURU's son as yet another benefit to NURU to ensure that he acted in Recology's interests, especially in connection with Recology's imminent request for a rate increase.  As discussed in further detail below, there is a close correlation between key events in Recology's rate increase process between 2015 and 2017 and GIUSTI's efforts to find NURU's son a paying job.

89.     On the morning of June 17, 2015, GIUSTI met with Recology SF General Manager A to discuss the schedule for the upcoming rate increase application. That afternoon, GIUSTI forwarded NURU's son's cell phone number to a Human Resources employee at Recology, telling her, "This is what I got from Mohammed." A few hours later the Human Resources employee advised GIUSTI that she would call NURU's son and connect him with Recology's staffing agency.

90.     The next morning, on June 18, 2015, Recology Executive 1 sent the draft schedule for the rate application process to NURU's immediate subordinate at DPW. Approximately one hour later, GIUSTI advised Recology's Human Resources employee in an email that "Mohammed said he [NURU's son] should be ready to start on Monday." Shortly afterwards, the Human Resources employee expressed concern about NURU's son in an email to GIUSTI: "I feel like we are going to have issues. [NURU's son] doesn't seem happy….I asked him if he still wanted to work at Recology, and he said he wanted to give it a try….I told him that he didn't seem to know much about the job, so I told him that he was going to be working from 8-2 M-F….What do you think?"

91.     The next evening, on June 19, 2015, the Human Resources employee sent GIUSTI an email with high importance, advising that she had contacted NURU's son again and he had completed the staffing agency paperwork that day and just needed to complete his work permit before he could start.

92.     NURU's son began working at Recology as a temporary laborer on or around June 22, 2015, painting debris boxes. He left to return to school in or around August 2015. I reviewed documents indicating that at the end of the summer, on August 10 and 11, the manager of the Recology unit where NURU's son worked paid almost $900 to Costco and Toto's Pizzeria for "going away lunch supplies for [NURU'S son] and drivers appreciation."

93.     In September 2015, Recology hired NURU's son again. He worked part-time during the 2015-2016 school year, and again during the summer of 2016 after he graduated from high school. The records I have reviewed show that from February 2016 through the end of

summer 2016, NURU's son was the only temporary worker supplied by the staffing agency to Recology.

94.     During this same time period, Recology continued to work on its upcoming rate increase application. As noted previously in this affidavit, on September 2, 2016, Recology sent its Notice of Intent letter to NURU, advising him that Recology would be submitting a draft rate application in early January 2017. The Notice of Intent triggered the official beginning of the months-long rate increase application process, over which NURU had significant influence. On February 10, 2017, Recology submitted its formal rate application. NURU then held multiple public hearings in March and April 2017, at which Recology executives including GIUSTI testified.

95.     On May 12, 2017, NURU submitted his Report and Recommended Order on Recology's requested rate increase. In it, NURU recommended that the Rate Board accept most of the increase that Recology asked for, an average increase of approximately 21 percent.

96.     Shortly afterwards, in or around the week of May 21, 2017, NURU's son returned to work for Recology part-time as a painter.

97.     About three weeks later, in or around June 7, 2017, Recology Vice President A, a high-level Recology executive, informed Recology's Chairman and Recology Executive 2 that NURU's son was working for them. The next day, June 8, 2017, Recology San Francisco General Manager B ("Recology SF General Manager B"), who was in charge of the business unit which employed NURU's son, texted GIUSTI: "Did you give the 3-star a heads up on [NURU's son]?" I believe, based on my review of the evidence, that "3-star" is military shorthand for a 3-star general, just below the highest-level general, and refers to Recology Executive 2. GIUSTI advised that he had.

98.     That same day, June 8, 2017, Recology terminated NURU's son. The evidence suggests that he was terminated in an in-person meeting with two of the highest-level executives at Recology, Recology Executive 2 and Recology SF General Manager B. I spoke to a witness involved in the sequence of events who advised me that NURU's son was terminated because it

would not look good for Recology to employ the son of its regulator.

99.     Payroll records show that by the time NURU's son was terminated, Recology had paid him a total of approximately $19,565 for his employment at the company from 2015 to 2017.

100.     Recology terminated NURU's son at one of the final moments in the rate increase process. After NURU issued his report approving Recology's request for a rate increase in May 2017, the public was allowed to submit objections. NURU then had to respond to objections. At the time Recology terminated NURU's son, NURU's responses to the objections—most of which claimed that the increase was too high—were pending. After the objections were rejected or otherwise resolved, the Rate Board would make a final decision about Recology's rate increase request, based on NURU's recommendation. It was therefore important, as Recology Executive 1 had previously noted, to keep NURU happy.

101.     I believe, based on my training and experience and evidence gathered during the course of this investigation, that this explains why GIUSTI moved very quickly to secure NURU's son another paying job. GIUSTI served as chairman of the board of a local non-profit organization, Non-Profit Organization C ("Non-Profit C"). I have reviewed documents which suggest that GIUSTI was aware that Non-Profit C was interested in creating a summer internship program and was looking for funding. Records indicate that GIUSTI arranged for Recology to fund a summer internship program at Non-Profit C—and that the summer intern was NURU's son.

102.     NURU's son began working at Non-Profit C on June 14, 2017. That same day, NURU issued his response to the public's objections to his recommendation to approve Recology's rate increase. At the end of that week, on June 19, 2017, the Rate Board adopted NURU's recommendation and approved Recology's request for a rate increase. The Chairman of Recology's board of directors praised Recology Executive 2 for "an incredible job in achieving this approval," telling Recology Executive 2 that he'd heard that "this year's process has been the smoothest in years."

33

103.    Two days later, on June 21, GIUSTI emailed Recology SF General Manager B and NURU's son's direct boss, asking them, "You guys want to take [NURU's son] to lunch on Tuesday to catch up and make sure he is doing okay?"  Recology SF General Manager B wrote back, "Kinda of an overkill.  What do you think?"

104.    GIUSTI moved so quickly to find a new way to compensate NURU's son that NURU's son didn't fill out an employment application until his first day of work, June 14, 2017. Although NURU's son was working with young children, he didn't complete his State of California Live Scan fingerprint check until July 12, 2017.  And he didn't fill out his W-4 withholding form for a full month, until July 25, 2017.  Moreover, I believe the importance to Recology of employing NURU's son is evidenced by the fact that he was paid $18 an hour by Non-Profit C—$2 per hour more than his supervisor for the first month.  Based on my knowledge, training and experience, I believe that GIUSTI arranged for a new job for NURU's son because he was aware that the fate of Recology's rate increase application rested with NURU, and he wanted to ensure that Recology continued to make NURU happy.

105.    At Non-Profit C, NURU's son quickly proved to be a challenging employee. According to a written reprimand, he was suspended just over a month after he started working, on July 17, 2017, after he repeatedly refused to work and on one occasion was caught in a "deep sleep."  Shortly after he started, his supervisor wrote in an email, "We're not letting [NURU's son] touch ANYTHING. His work is horrible with even basic spelling mistakes. [Non-Profit C's Executive Director] says he's only allowed to do manual labor.  I'm still having him help me with [one project], but other than those two, we're limiting the damage…"  I spoke to a witness familiar with NURU's son's employment at Non-Profit C who described NURU's son's work that first year as "terrible," although they acknowledged that his work improved as the summer went on.

106.    Despite his poor performance, Non-Profit C did not fire NURU's son.  He worked for the remainder of the summer and received $5,920.20 in compensation from Non-Profit C. Non-Profit C, in turn, sent GIUSTI an invoice for a total of $9,600, with the generic description

"Summer Youth Program." The invoice did not make any mention of NURU's son. GIUSTI arranged for Recology to pay the invoice.

107.    In summer 2018, NURU's son returned to Non-Profit C, and GIUSTI again arranged for Recology to sponsor a "Summer Youth Intern Program" to pay his salary. Very shortly after he began working his second summer, he was reprimanded again. The written reprimand stated that NURU's son told children to "shut up" and physically harmed one child, who reported that NURU's son had "grabbed his arm and twisted it enough that his hand 'cracked.'" Nevertheless, Non-Profit C once again kept him on and paid him $4,870 in compensation. Non-Profit C sent GIUSTI an invoice for Recology for a total of $14,000 for a generic "Summer Youth Intern Program," and GIUSTI again arranged for Recology to pay the invoice.

108.    GIUSTI remained involved in NURU's son's employment at Non-Profit C. In a recorded call on August 24, 2018, NURU asked GIUSTI to intervene on his son's behalf at Non-Profit C to help his son obtain more hours of employment. He asked GIUSTI, "Hey hey, can you talk to [Non-Profit C's Executive Director]? He cut [NURU's son] back to 20 again." The wire intercept captures GIUSTI sighing, and telling NURU that he would talk to the Executive Director. NURU told him, "Yeah, that way he's not, you know, he has a lot of free time on hands." GIUSTI agreed, and NURU responded, "He has about two more weeks or so before he goes back to school." GIUSTI told him, "Yeah, that's not good," and NURU agreed, telling him, "Yup."

109.    I believe, based on my training and experience, that Non-Profit C retained NURU's son despite his significant issues because the chairman of their board, GIUSTI, wanted to keep him employed. Non-Profit C also may have benefitted from the arrangement: in early 2019, NURU arranged for Non-Profit C to take over administration of the Recology-funded DPW community program from Non-Profit A.

110.    The timing of NURU's son's employment at Recology and Non-Profit C indicates that GIUSTI used his position of authority at both organizations to ensure that NURU's son

35

received paid employment from 2015 to 2018. The fact that NURU's son appears to have been the only summer intern funded by Recology at Non-Profit C in 2017 indicates that Recology's grant was a guise created by GIUSTI to conceal that NURU's son's wages actually came from Recology.

### 4. GIUSTI Arranges for Recology to Pay for a DPW Employee Funeral, Disguised as a Donation to Non-Profit A

111.    In June of 2016, as Recology was preparing its rate increase application, GIUSTI arranged for Recology to secretly pay for the funeral of a DPW employee, disguised as a donation to the previously mentioned non-profit, Non-Profit A.

112.    On the morning of June 1, 2016, Sandra Zuniga—a DPW employee and NURU's longtime girlfriend—emailed GIUSTI and carbon-copied NURU.[13] She told GIUSTI that the mortuary needed payment for the funeral of a DPW employee by that afternoon, and attached an invoice from the mortuary which showed a balance due of $3,500. Based on my training and experience, I believe this is an indication that NURU and/or Zuniga had asked GIUSTI if Recology would pay for the funeral, and GIUSTI had agreed.

113.    Rather than paying the mortuary bill directly, however, GIUSTI arranged for Non-Profit A to pay for it. On June 3, 2016, Non-Profit A's Executive Director emailed GIUSTI that she was following up on "the DPW donation for the funeral" and asking what GIUSTI needed from her. GIUSTI wrote back, "First off thank you so much for helping out with this, you are a lifesaver! Can you just send me and copy [Recology Assistant A] an extra invoice for $3,500 for community service project? [Recology Executive 2] knows about it and he will approve the invoice for me."

114.    The following day, Non-Profit A's Executive Director emailed GIUSTI an invoice for $3,500 for "Donation for DPW Partnership." In her cover email, Non-Profit A's Executive Director wrote, "We were glad to be able to help with the logistics for DPW

_____

[13] Zuniga was charged by Criminal Complaint with money laundering on June 3, 2020, in connection with a scheme to launder the proceeds of bribes received by NURU.

employee's funeral." That same day, Non-Profit A's Executive Director used her Non-Profit A Wells Fargo credit card to make a $3,500 payment to the mortuary.

115.    GIUSTI then made arrangements for Recology to pay Non-Profit A's invoice for "Donation for DPW Partnership," asking that it be "processed ASAP." Recology Executive 2 signed off on the expense, and on June 16, 2016 Recology wired $3,500 to Non-Profit A.

116.    Based on my knowledge, training and experience, I believe GIUSTI orchestrated this process—arranging for Non-Profit A to pay the funeral home and create a false donation invoice for reimbursement by Recology—to conceal the fact that Recology paid for a DPW employee's funeral.

## CONCLUSION

117.    Based on the foregoing and my training and experience, I respectfully submit that there is probable cause to believe that GIUSTI bribed NURU, in violation of Title 18, United States Code Section 666(a)(2) and 2, and engaged in concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and 2.

 Mark Twitchell /s/_____
MARK TWITCHELL
Special Agent
IRS-Criminal Investigations


Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this _17_ day of November 2020.

_____
HONORABLE SALLIE KIM
United States Magistrate Judge